Date signed October 15, 2008



**JAMES F. SCHNEIDER**
**U. S. BANKRUPTCY JUDGE**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| In re: | * | |
| BALTIMORE EMERGENCY SERVICES II, ET AL., | * | Case Nos. 02-67584-JS Jointly Administered |
| | * | |
| Debtors | | (Chapter 11) |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

### *MEMORANDUM OPINION SUSTAINING DEBTORS' OBJECTION TO THE CLAIM OF PACE & GOLDSTON, LLP IN THE AMOUNT OF $88,255.33*

Before the Court is the debtors' objection [P. 2864] to the unsecured claim of Pace and Goldston, LLP [Claim No. 1193] in the stated amount of $88,255.33.[1] For the following reasons, the objection will be sustained and the claim will be disallowed.

---

[1] This Court has determined that the claim of Pace & Goldston was incorrectly calculated, to the detriment of the claimant. When properly totaled, the numbers contained in documents appended to the proof of claim add up to $95,429.91, rather than the figure claimed of $88,255.33. A review of the invoices submitted in support of the claim reveals several obvious errors. For example, the identical amount of $15,291.27 is asserted as the total of two different invoices. The Court's own calculations indicated that all of the totals submitted on the face sheet of the claimant's exhibit submitted at the hearing were incorrect. Nevertheless, for purposes of the objection, the parties have treated the claim as having been calculated correctly.

*FINDINGS OF FACT*

1. On November 8, 2002 and November 11, 2002, Baltimore Emergency Services II, LLC and its affiliates (the "debtors") filed 240 Chapter 11 cases in this Court. Case Nos. 02-67576 through 02-67815.

2. On February 28, 2003, another 16 affiliated debtors filed additional Chapter 11 petitions. Case Nos. 03-53267 through 03-53282.

4. On April 23, 2003, another Chapter 11 case was filed by General Emergency Medical Services, LLC. Case No. 03-56806.

5. By order [P. 780] dated June 12, 2003, the Court (Derby, J.) directed that the foregoing Chapter 11 cases be jointly administered under Case No. 02-67584.

6. The debtors operated three businesses in the field of health care. Two of the businesses were national physician practice management companies that provided staffing and physician management services for hospitals, primarily for emergency departments. The third business was a network of medical clinics that offered services in primary and urgent care, pediatrics and gynecology. The debtors had over 2,000 physicians under contract at approximately 250 hospitals and 26 clinics, with an estimated patient population of four million people. Motion for Joint Administration, [P. 624] ¶¶ 3 and 4.

7. One of the debtor's pre-petition malpractice insurers was The Reciprocal Alliance ("TRA"). Under the insurance contract between TRA and the debtors, TRA had a duty to pay for the defense of any medical malpractice claim asserted against the debtors. Debtors' Ex. No. 1, p. 6, ¶ B. The TRA policy was in effect from January 1, 1999 to January 1, 2002, during which time 76 claims were filed against the debtors and/or their physician employees.

8. Pace and Goldston ("the claimant") is a law firm engaged by TRA to defend two of the debtors' contract physicians against lawsuits for medical malpractice. Pace and Goldston worked under a contract with TRA that has not been entered into evidence. Pace and Goldston submitted into evidence the invoices upon which its proof of claim was based. The invoices cover the period from July 1, 2002 to December 20, 2002 (with some minor charges incurred in January 2003). Although some of the invoices are marked as paid, it is uncontested that they were all unpaid by TRA, and that the ones marked "Paid" were paid by checks later determined to be worthless. Of the $95,429.91 amount reflected in the invoices, the Court has determined that $76,339.61 represents the prepetition portion of the claim, and that $19,030.30 is the amount of the postpetition claim.

9. On January 28, 2003, TRA's reinsurer, Reciprocal of America, was placed into receivership by the State of Virginia. On January 31, 2003, the Tennessee

Department of Insurance, by consent order, placed TRA in receivership and announced its intention to liquidate the company.  Afterward, the debtors obtained additional self-funded policies of insurance from Everest Indemnity Insurance Co. ("Everest") and American International Surplus Lines Insurance Co. ("AISLIC") to provide coverage for the TRA insureds.  The new policies provided coverage on an excess basis, and are in addition to any coverage that may be available from the TRA estate, provided that the excess coverage and any recovery from the TRA estate is limited to $1 million per claim.  This coverage provides compensation for "claims filed" against physicians who were the insureds of TRA.

10.  By order [P. 839] entered on July 1, 2003, the debtors implemented an alternative dispute resolution procedure (the "PrePlan ADR") for the liquidation and satisfaction of malpractice claims.  The confirmation order approved the Plan's ADR in its entirety.

12.  On November 20, 21, 24 and 25, 2003, Judge Derby conducted hearings on the sale of substantially all of the debtors' assets, pursuant to the Second Amended Joint Plan of Reorganization of Baltimore Emergency Services II, LLC and Its Affiliated Debtors (the "Plan").  At the conclusion of the hearing, the Court approved the offer of Sterling Healthcare, Inc. ("Sterling").

13. On December 17, 2003, the was Plan was confirmed by order [P. 1739] signed by Judge Derby.

14. On February 1, 2004, the Asset Purchase Agreement was executed between Sterling and certain debtors. The sale closed on February 6, 2004.

15. As part of the purchase price, Sterling assumed the debtors' medical malpractice liabilities and agreed to fund them through policies of insurance which it agreed to purchase to provide funding for the distribution scheme contained in the Plan ADR. Asset Purchase Agreement, § 2.13, Exhibit C to the confirmation order dated December 17, 2003 [P. 1739].

16. On February 6, 2004, the effective date of the Plan, the debtors declared that all the conditions precedent to the effectiveness of the Plan were satisfied in accordance with its terms.

17. After the Asset Purchase Agreement was executed, two of the debtors' principal medical policies, the Everest-021 policy and the AISLIC-435 policy, became insolvent, requiring Sterling to assume the debtors' medical malpractice liabilities.

18. On February 16, 2004, Pace & Goldston filed an untimely proof of claim[2] (Claim No. 1193) as a general unsecured creditor in the amount of $88,255.33,

---

[2] By order [P. 1890] entered on February 10, 2004, Judge Derby authorized Pace & Goldston to file a late claim by reason of the claimant's excusable neglect, in response to its unopposed motion to do so filed on December 16, 2003 [P. 1728].

pursuant to Federal Rules of Bankruptcy Procedure 3003(c) and 9006(b)(1). Documents attached to the proof of claim indicated that the claim was based upon an insurance policy (Policy No. APL1510800) issued by TRA, in which the insured was indicated to be PhyAmerica Physician Group, Inc.[3]

20. On November 8, 2004, the debtors filed an objection [P. 2864] to the proof of claim, pursuant to Sections 502(b), 1106(a) and 1107(a) of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 3003 and 3007.

21. Judge Derby addressed the extent of Sterling's responsibility to purchase additional policies of insurance in a "Memorandum Opinion Clarifying and Interpreting Confirmation Documents" [P. 342], dated April 28, 2005, in *Sterling Healthcare, Inc., et al., Plaintiffs v. American International Specialty Lines Insurance Co., et al., Defendants*, Adversary Proceeding No. 04-2322-SD. In the opinion, Judge Derby made the following findings of fact and conclusions of law that are relevant to the instant controversy:

> Part of the purchase price paid by Sterling was the assumption of the debtor's medical malpractice liabilities. Sterling also agreed to fund the medical practice liabilities through insurance.

Memorandum Opinion at 3, citing Section 2.13 of the Asset Purchase Agreement.

---

[3]PhyAmerica Physician Group, Inc., doing business as SMS Merger Corp., was one of the 240 debtor entities that filed Chapter 11 on November 11, 2002. Case No. 02-67737.

22. The liquidation trustee[4] and the claimant have each cited Judge Derby's opinion in support of their respective positions.

23. The opinion addressed the problem that neither policy had sufficient funds to pay the remaining claims covered by the policies. Judge Derby set out the procedures for handling prepetition and postpetition malpractice claims in light of the shortage of insurance coverage, but also stated that the Court would "not address any issues for pre- or post-petition claims under insurance policies where either the coverage has not been shown to be inadequate or the companies that issued the policies are being administered in receivership." Memorandum Opinion at 13. Therefore, TRA was explicitly excluded from Judge Derby's ruling.

24. The liquidation trustee argued that the claim appears to be asserted against a non-debtor entity. The invoices that the claimant attached to its proof of claim referenced TRA as the responsible party and not the debtors. It is further noted that there is no privity between them and no contract between the debtors and the claimant that provided for the claimant to represent any of the doctors under the insurance plan.

25. The liquidation trustee also argued that there are two levels to the analysis of whether the trust for the unsecured creditors under the Plan and the ADR are responsible for paying the claim. The first is the determination whether the claimant

---

[4]The liquidation trustee has taken up the debtors' objection as his own.

has a claim against the bankruptcy estate, and second, if so, how the claim is to be paid.

26.  If the claim could be allowed against the estate, the liquidation trustee contends that it must be paid *pro rata* with other unsecured tort claims in Class 4B, because Judge Derby so held in the April 28, 2005 opinion.  However, because the Plan contemplated that Pace & Goldston would be paid solely from insurance policies (the TRA insurance policies), the liquidation trustee contends that the claim must be disallowed.

27.  Pace & Goldston argued that its claim is based upon either a third party beneficiary theory or quasi-contract principles under state law.  It contended that the law firm performed its contract with TRA.  It also contended that, having no relation to unsecured tort claimants, the claim should not be paid *pro rata* with other claims in Class 4B.  Its duty as counsel was owed to the doctors it represented, and by implication, the debtors, and not the insurance companies, citing Rule of Professional Conduct 5.4.

*CONCLUSIONS OF LAW*

1. This is a core proceeding within the subject matter jurisdiction of this Court, pursuant to Section 157(b)(2)(A), (B), (L) and (O) of the United States Judicial Code,

28 U.S.C.,[5] because the instant matter is the debtors' objection to a claim filed against

---

[5]Section 157(b) provides as follows:

### 28 U.S.C.A. § 157.  Procedures

\*     \*     \*     \*     \*

(b)(1) Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.

(2) Core proceedings include, but are not limited to –

(A) matters concerning the administration of the estate;

(B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11;

(C) counterclaims by the estate against persons filing claims against the estate;

(D) orders in respect to obtaining credit;

(E) orders to turn over property of the estate;

(F) proceedings to determine, avoid, or recover preferences;

(G) motions to terminate, annul, or modify the automatic stay;

(H) proceedings to determine, avoid, or recover fraudulent

the bankruptcy estate affecting its administration, the resolution of which requires the bankruptcy court to interpret the terms of the debtors' confirmed Plan and other documents appended to the Plan, including an asset sale agreement and Plan ADR.

2. In the case of *Valley Historic Ltd. Partnership v. Bank of New York*, 486 F.3d 831 (4th Cir. 2007), the Fourth Circuit expounded on the extent of the subject

---

conveyances;

    (I) determinations as to the dischargeability of particular debts;

    (J) objections to discharges;

    (K) determinations of the validity, extent, or priority of liens;

    (L) confirmations of plans;

    (M) orders approving the use or lease of property, including the use of cash collateral;

    (N) orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate;

    (O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims; and

    (P) recognition of foreign proceedings and other matters under chapter 15 of title 11.

28 U.S.C. § 157(b).

matter jurisdiction that a bankruptcy court may exercise in a Chapter 11 case after the confirmation of a plan:

> *Pacor* [*, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir.1984)] was decided in a pre-confirmation context, however, and the Third Circuit has since examined "related to" jurisdiction from a somewhat different analytical perspective, in a post-confirmation context. Recognizing that "[c]ourts have applied varying standards to determine whether 'related to' jurisdiction should be upheld post-confirmation," it endeavored to distill the "essential inquiry" or common thread throughout the decisions, including our decision in *Bergstrom. Binder v. Price Waterhouse & Co. ( In re Resorts Int'l, Inc.)*, 372 F.3d 154, 166 (3d Cir. 2004). In its view, "the essential inquiry appears to be whether there is a close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter." *Id*. at 166-67. According to the court, for "related to" jurisdiction to exist at "the post-confirmation stage, the claim must affect an integral aspect of the bankruptcy process – there must be a close nexus to the bankruptcy plan or proceeding." *Id*. at 167. Practically speaking, under this inquiry "[m]atters that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus." *Id*.
>
> We find the Third Circuit's "close nexus" requirement to be a logical corollary of "related to" jurisdiction. Analytically, it insures that the proceeding serves a bankruptcy administration purpose on the date the bankruptcy court exercises that jurisdiction. Without such a purpose, "related to" jurisdiction would extend beyond the limited jurisdiction conferred upon bankruptcy courts in the post-confirmation context.

486 F.3d at 836-7.

3. Under 11 U.S.C. § 502(a), a creditor's proof of claim is deemed allowed unless a party-in-interest objects. When there is an objection by an interested party,

11

the Court shall, after notice and a hearing, determine the proper amount of the claim as of the date of the petition, and shall allow such claim unless such claim fits into one of the categories forbidden by 11 U.S.C. § 502(b). Under 11 U.S.C. § 502(b)(1), the claim should not be allowed if it would not be enforceable under applicable law. Under Bankruptcy Rule 3001(f), a proof of claim filed in appropriate form with appropriate documentation shall constitute *prima facie* evidence of its validity. To overcome this presumption, the objecting party must demonstrate by evidence, a defense to one or more elements of the cause of action asserted in the claim, which would render the claim unenforceable. *See In re Gates*, 214 B.R. 467, 472 (Bankr. D. Md. 1997) (Keir, J.)

    4. The Court must sustain the objection because there is no evidence that under state law, the claim of Pace & Goldston would be enforceable.

    5. There has been no argument as to which state's law this Court should apply. The insurance contract between TRA and PhyAmerica contains no governing forum selection clause. TRA is now in receivership under the aegis of the Tennessee Department of Insurance. Pace & Goldston is based in Texas and presumably performed its work there. PhyAmerica was based in North Carolina.

    6. Federal Courts must apply the conflict of law rules of the jurisdictions in which they are situated. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61

S. Ct. 1020, 1021-22, 85 L. Ed 1477 (1941). In contract cases, Maryland courts apply the principle of *lex locus contractus*, pursuant to the law of the jurisdiction where the contract is made determines its validity and construction. *E. Stainless Corp. v. Am. Protection Ins. Co.*, 829 F. Supp. 797, 799 (D. Md. 1993) (citing *Kramer v. Bally's Park Place*, 311 Md. 387, 390, 535 A.2d 466 (1988)). The insurance contract in the instant case indicated that it was finalized at the "mailing address of the named insured [PhyAmerica Physician Group, Inc]..." Claimant's Exhibit No. 1, p. 2. Accordingly, as to the allegation of Pace & Goldston that it was a third-party beneficiary of the contract between the debtors and TRA, this Court must apply the law of North Carolina.

7. However, as to the claimant's assertion that it is a party to a quasi-contract with the debtor, the *lex loci contractus* principle is inapplicable because there is no actual contract, and thus no final place of formation. This Court has found no Maryland case applying choice of law principles to an alleged quasi-contract. In circumstances where the choice of law is questionable, Maryland courts have relied upon the Second Restatement of Conflicts of Laws. *See, e.g. Traylor v. Grafton*, 273 Md. 649, 660, 332 A.2d 651, 659 (1975); *see also Accrued Fin. Servs., Inc. v. Prime Retail, Inc.*, 298 F.3d 291, 300 (4th Cir. 2002) (Michael, J., dissenting) (Maryland has

adopted section 187 of the Restatement (Second) of Conflict of Laws). The Restatement asserts:

> The validity of a contract for the rendition of services and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state where the contract requires that the services, or a major portion of the services, be rendered, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.

Restatement (Second) of Conflicts of Laws § 196 (1971).

8. Pace & Goldston performed the services entirely in Texas, and accordingly, Texas law governs the existence of a quasi-contract between the claimant and the debtors.

9. The Court has found no cases from North Carolina or Texas, and only one case nationally, where a law firm, unable to collect payment from the insurance company which engaged its services, sued the insured party for attorney's fees. *See Cooper v. Cranin*, 479 N.Y.S.2d 254 (N.Y. App. Div. 1984). In that case, a lawyer was purportedly hired by an insurance company to defend a dental malpractice claim. *Id.* at 255. Unbeknownst to everyone, the insurance company did not exist. *Id.* Reversing a lower court's refusal to allow the dentist to substitute counsel upon learning of this information without paying the attorney's unpaid fees, the New York

Supreme Court, Appellate Division held that because the dentist had paid over $15,000 in malpractice premiums in order to obtain the benefit of a legal defense, and had no role in selecting the lawyer, the lawyer could not collect from the dentist. *Id.*

10. It is acknowledged that *Cooper* dealt only briefly with the underlying issue determinative in the present case, and thus is unimpressive with regard to any precedential value. However, the Court finds that the sparse treatment given the matter by *Cooper* and the lack of any other precedent on the issue is illustrative of the tenuousness of the claimant's argument.

11. More common are the attempts by law firms to collect unpaid insurance claims from agencies or organizations created by states that guarantee insurance obligations. In one such case, a law firm attempted to fit into the guarantor's narrow definition of "covered claim" by asserting its status as a third-party beneficiary and also as a party to a quasi-contractual agreement. *See White v. Alaska Ins. Guar. Ass'n,* 592 P.2d 367 (Alaska 1979). Affirming the trial court's rejection of these arguments, the Supreme Court of Alaska found that the law firms were only incidental beneficiaries of the contract between the insurance company and its policyholders. *Id.* at 369. Because there was no evidence that the policyholders and the insurance companies contracted with the purpose of benefitting the law firms, the law firm could

not claim third-party beneficiary status merely by relying on the contract. *Id., citing Century Ins. Agency v. City Commerce Corp.*, 396 P.2d 80, 82 (Alaska 1964).

12. Under North Carolina law, a party seeking to sue in a third-party beneficiary capacity must show:

> (1) that a contract exists between two persons or entities; (2) that the contract is valid and enforceable; and (3) that the contract was executed for the direct, and not incidental, benefit of the [third party]. A person is a direct beneficiary of the contract if the contracting parties intended to confer a legally enforceable benefit on that person. It is not enough that the contract, in fact, benefits the [third party], if, when the contract was made, the contracting parties did not intend it to benefit the [third party] directly. In determining the intent of the contracting parties, the court should consider the circumstances surrounding the transaction as well as the actual language of the contract. When a third person seeks enforcement of a contract made between other parties, the contract must be construed strictly against the party seeking enforcement.

*Babb v. Bynum & Murphrey, PLLC*, 182 N.C. App. 750, 754. 643 S.E.2d 55, 57-58 (2007), *quoting Country Boys Auction & Realty Co. v. Carolina Warehouse, Inc.*, 180 N.C. App. 141, 146, 636 S.E.2d 309, 313 (2006).

13. Pace & Goldston does not have standing to sue as a third-party beneficiary because there is no evidence that the debtors intended to benefit Pace & Goldston when they contracted with TRA.

14. Nor does Pace & Goldston have standing to enforce its claim under a theory of *quantum meruit* or quasi-contract. Under Texas law, in order to establish liability under that theory, one must prove:

> (1) valuable services were rendered or materials furnished; (2) for the person sought to be charged; (3) which services and materials were accepted by the person sought to be charged, used and enjoyed by him; (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff in performing such services was expecting to be paid by the person sought to be charged.

*In re Guardianship of Fortenberry*, – S.W.3d –, 2008 WL 3984046 at *8 (Tex. App), *quoting Vortt Exploration Co. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990).

15. Pace & Goldston cannot prove the existence of a quasi-contract under Texas law because there is no proof before the Court that the debtors were reasonably notified that they were expected by Pace & Goldston to pay the legal fees that normally would have been paid by TRA. TRA went into receivership on January 31, 2003, approximately the same time when Pace & Golston's invoices end. While the Court makes no finding as to the debtor's knowledge of TRA's pending insolvency, there is no evidence on the record that Pace & Goldston communicated to the debtor an expectation that the debtor would pay its fees. In fact, TRA attempted to pay Pace & Goldston for some of its work, but its check bounced. Under such circumstances,

the Court cannot impute to the debtor knowledge that Pace & Goldston expected its payment to come from anyone other than TRA.  The debtor timely paid its premiums to TRA, and TRA had a duty to pay any attorney hired to defend the debtor.  There is no reason to believe that at any point, the debtor assumed TRA's obligations in this regard.

    16.  Because the Court has decided that Pace & Goldston does not have an allowable claim, it need not decide what class such claim would fall under were it to have been allowed.  It is enough that neither the Plan nor the appended documents provided for the treatment of the claim.

    WHEREFORE, the debtors' objection will be SUSTAINED and the claim of Pace & Goldston will be DISALLOWED.

    ***ORDER ACCORDINGLY.***

cc: Martin T. Fletcher, Esquire
Whiteford, Taylor & Preston, LLP
Seven Saint Paul Street, Suite 1400
Baltimore, Maryland  21202

Joel I. Sher, Esquire
Shapiro Sher Guinot & Sandler
36 South Charles Street, Suite 2000
Baltimore, Maryland  21201

David S. Cohen, Esquire
Milbank, Tweed, Hadley & McCloy, LLP
1825 "Eye" Street NW, Suite 1100
Washington, D.C.  20006

Steven D. Goldston, Partner
Pace & Goldston, LLP
8226 Douglas Avenue, Suite 520
Dallas, Texas  75225

Robert J. Moore, Esquire
Fred Neufeld, Esquire
Milbank, Tweed, Hadley & McCloy LLP
601 S. Figueroa Street, 30th Floor
Los Angeles, California  90017

Barton J. Sidle, Esquire
9515 Deereco Road, Suite 902
Timonium, Maryland  21093

Office of the U.S. Trustee
2625 U.S. Courthouse
101 West Lombard Street
Baltimore, Maryland  21201